GULDEN v. CHANCE et al.

(Circuit Court of Appeals, Third Circuit. August 18, 1910.)

No. 1,353.

1. TRADE-MARKS AND TRADE-NAMES (§ 55*)—INFRINGEMENT—INTENT.

The infringement of a trade-mark, either registered or unregistered, does not necessarily involve actual fraud, or even wrongful intent, on the part of the infringer.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 63; Dec. Dig. § 55.*]

2. TRADE-MARKS AND TRADE-NAMES (§ 75*)—UNFAIR COMPETITION—IMITATION OF PACKAGES.

In determining an issue of unfair competition by a manufacturer in imitating the label or dress of a competitor, under which the article is sold at retail, the question is not whether jobbers or dealers would be deceived, but whether the resemblance is such as is calculated and intended to deceive the ultimate purchaser.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 86; Dec. Dig. § 75.*

Unfair competition, see notes to Scheuer v. Smiller, 20 C. C. A. 165; Lare v. Harper & Bros., 30 C. C. A. 376 ]

3. TRADE-MARKS AND TRADE-NAMES (§ 67*)—UNFAIR COMPETITION—RIGHT TO PROTECTION.

A defendant, shown to have indulged in unfair competition with respect to the business of the complainant, carried on under certain labels and packages, is not entitled to immunity by reason of the fact that complainant has used in his business other labels and packages, as to which no charge of unfair competition can be made.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Dec. Dig. § 67.*]

4. TRADE-MARKS AND TRADE-NAMES (§ 70*)—UNFAIR COMPETITION—IMITATION OF PACKAGES.

Defendants held chargeable with unfair competition with complainant, a packer and seller of olives in bottles, by using a name and symbol similar to those previously adopted by complainant as trade-marks, although not infringements thereof, in connection with labels and bottles of such similarity to the special designs in use by complainant as to evidence design, and as to be calculated to deceive retail purchasers.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 81; Dec. Dig. § 70.*]

Appeal from the Circuit Court of the United States for the Eastern District of Pennsylvania.

Suit in equity by Charles Gulden against Robert C. Chance, Albert Chance, and Wilmer Chance, copartners as R. C. Chance's Sons. Decree for defendants (180 Fed. 178), and complainant appeals. Reversed.

The illustrations herewith shown are of certain olive bottles, with their dress, discussed in the opinion.

Timothy D. Merwin, for appellant.

Frank P. Prichard, for appellees.

Before BUFFINGTON and LANNING, Circuit Judges, and BRADFORD, District Judge.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

BRADFORD, District Judge. This is an appeal from a decree of the circuit court of the United States for the eastern district of Pennsylvania dismissing the bill of complaint in a suit brought by Charles Gulden, the appellant, hereinafter referred to as the complainant, against Robert C. Chance, Albert Chance and Wilmer Chance, copartners in business as R. C. Chance's Sons, hereinafter referred to as the defendants, for an injunction and account for alleged infringement of certain registered trade-marks, and for alleged unfair competition in trade. The complainant for about thirty-five years has been engaged in the city of New York in the business of importing, packing and dealing in olives raised in or about Seville, Spain, and prior to January 6, 1892, adopted as a trade-mark for olives the words "Don Carlos," and has since continuously used and is still using that trade-mark in connection with them. That trade-mark was duly registered in the United States patent office January 11, 1895, and thereafter, pursuant to the provisions of the act of Congress of February 20, 1905, the same was again duly registered in that office January 2, 1906. Prior to May 16, 1899, the complainant adopted and has ever since used and is still using as a trade-mark for stuffed olives a representation of a split olive stuffed with red peppers. This trade-mark also was duly registered in the patent office November 28, 1905. The trade-mark "Don Carlos" has been and is usually employed by the complainant in connection with olives by printing the same in bronze and red ink upon a white paper label of oval form with a bronze border pasted upon the body of the bottle containing the olives. The other registered trade-mark namely, the representation of a split olive stuffed with red peppers, has been and is usually employed by him in connection with stuffed olives by imprinting the same upon a circularly curved depending ear or flap of a white bronze-bordered label pasted upon the neck of the bottles containing the olives. The complainant prior to, January 2, 1906, adopted and ever since has used and is still using on bottles containing his olives, together with the trade-mark "Don Carlos" other marks and labels, among which are the picture of an olive branch bearing leaves and olives imprinted in bronze ink with that trade-mark and the name of the complainant upon body labels; the words "Spanish Queen Olives" printed in bronze and red ink within a bronze circle upon a white paper label, with the picture of an olive branch bearing leaves and olives printed in bronze ink on each side of the circle, the label being pasted around the neck of the bottle containing the olives; and a dark red metal foil cap affixed to the top of the neck of the bottle. The complainant prior to January 2, 1906, adopted and ever since has used and is still using to distinguish stuffed olives prepared and sold by him an olive bottle having circumferential grooves or corrugations and a bell-shaped or flaring mouth, and having affixed thereto the label representing the split olive stuffed with red peppers printed upon the circularly curved depending ear or flap of the white bronze-bordered label pasted upon the neck of the bottle. The complainant more than a year before the bringing of this suit adopted and has continuously used and is still using various other forms and sizes of bottles and labels attached to them for the purpose of distinguishing bottles containing his olives.

In fact the defendants admit in their answer that at the time of the filing of the bill "complainant was using on some of the bottles of olives sold by him a white paper label of oval form, with a bronze border and containing the name 'Don Carlos,' printed in bronze and red inks," and was also then "using upon some bottles of olives sold by him, a label having a circularly curved depending ear, upon which label was a representation intended by complainant to represent a split olive, stuffed with red peppers," and was also then "using on some of the bottles of olives sold by him, and in connection with the name 'Don Carlos,' the picture of an olive branch bearing leaves and olives imprinted in bronze ink, and also a label with the words 'Spanish Queen Olives' printed in bronze and red ink within a bronze circle, upon a white paper label, with the picture of an olive branch bearing leaves and olives printed with bronze ink on each side of said circle." The defendants further admit in their answer that "they are using in their trade bottles substantially similar in size and shape to the bottles to which is attached the complainant's label bearing the name 'Don Carlos' "; that "upon bottles of olives sold by them, they are using a label, not of oval shape, but of irregular shape, and longer than it is broad, which label is printed on white paper, with a bronze border"; that such label "has on it the name 'Don Cæsar,' and the representation of an olive branch bearing leaves and olives"; that "their bottles also bear white neck labels, with a circle of bronze containing the words 'Queen Olives,' and with representations of olive branches bearing leaves and olives"; that "they use on their bottles cap seals of metal foil, and that some of these cap seals are of dark red color"; that "they have sold stuffed olives in bottles circumferentially corrugated, and with flaring mouths substantially resembling the bottles used by complainant"; and that "on such bottles used by respondents they have attached neck labels, containing a circle on which is printed the words 'Manzanilla Olives,' and with the representation of a plate of stuffed olives, and as the lower part of the circle extends below the neck label, it is possible to describe these labels as having circularly curved depending ears." Exhibits A, B and C attached to the bill are complainant's labels, and his Exhibits 4, 5 and 6 are samples of his bottles, bearing his labels and trade-marks which are alleged to be infringed or wrongfully imitated by the defendants through and by Exhibits 7, 8 and 9, which are labeled bottles of defendants containing their olives. It is admitted by the defendants that Exhibit 7, being their "bottle of Don Cæsar brand of olives," and Exhibit 8, being their "ring bottle of stuffed olives," and Exhibit 9, being their "bottle of olives with flaring bottom," were "packed and the labels thereon affixed by defendants for the purpose of selling the same, and that the same were sold, in commerce among the several states, before the commencement of this suit." This case was before this court at the October Term, 1908 (165 Fed. 624, 92 C. C. A. 58), on an appeal from an interlocutory decree awarding a preliminary injunction restraining the present appellees from using the name "Don Cæsar" or any equivalent thereof upon or in connection with or as a designation of olives packed and sold or offered for sale by them, and from putting up, packing, offering for sale, or selling olives in glass

bottles or other packages. or otherwise with the name "Don Cæsar" or any equivalent thereof, attached or affixed thereto or in connection therewith as a designation or identification thereof; and from infringing upon Gulden's trade-mark "Don Carlos" by using in connection with or as a designation of olives sold or offered for sale by them the words "Don Cæsar," or any other words that are a colorable imitation of the words "Don Carlos" or in any other manner whatever. This court reversed the interlocutory decree, holding that the mere use of the words "Don Cæsar" as applied to olives was not an infringement of Gulden's trade-mark "Don Carlos," and saying:

"In the opinion of the court below, the use of the trade-mark 'Don Cæsar' was a clear infringement of the trade-mark 'Don Carlos' used by complainant. So that, whether the 'Don Cæsar' was used on a label in colorable imitation of complainant's, or upon any label, or in any way affixed to any bottle, keg, box or package, it was held to have infringed the property right of the complainant to his trade-mark 'Don Carlos,' even though there were no fraudulent attempt to imitate or otherwise appropriate the same. Indeed the decree, by its express language, precludes, as the opinion of the court disavows, any idea or suggestion of unfair competition by reason of the size, color, or general appearance of any label on which the name 'Don Cæsar' appears. It is a bald injunction against the use by the defendants of the name 'Don Cæsar,' by whatever devices accompanied or however affixed to any package of olives packed by them. All question of unfair competition, therefore, is eliminated from consideration in this appeal, the sole question being whether the use of the words 'Don Cæsar,' however placed, upon any package of defendants' olives was an infringement of the property right of complainant in his trade-mark of 'Don Carlos.' This property right related to the words 'Don Carlos' alone, unaccompanied by any label, device, figure or coloring. As stated by the complainant in his application for registration under the act of Congress, the trade-mark consists of the word 'Don Carlos.' The court below has distinctly said that the facts are not enough to make out a charge of unfair competition, and its decree rests solely upon similarity of the historical name used by defendants to that used by the complainant, irrespective of any question as to the intent of the defendants and of any evidence in regard thereto. * * * If there were any fraud or unfair competition on the part of the defendants, in the manner of using the words 'Don Cæsar' on their packages of olives, as alleged by complainant in his bill, the court will have an opportunity to deal with that charge at the final hearing, upon the testimony adduced by the complainant and upon that which may hereafter be adduced by the defendants relevant thereto."

We are thoroughly satisfied of the correctness of the views thus expressed by this court on the former appeal and re-affirm the proposition then laid down to the effect that the use of the name "Don Cæsar" as applied to olives is not of itself an infringement of the trade-mark "Don Carlos" as applied to them. The infringement of a trade-mark either registered or unregistered does not necessarily involve actual fraud or even wrongful intent on the part of the infringer. Nor does the former opinion of this court on a fair reading lend any countenance to such an idea. The owner of a valid trade-mark has a vested right of property in it, of the benefit of which he cannot against his will be deprived by any other person with impunity, whatever may be his motive. What was said on that occasion touching fraud manifestly had relation to unfair competition in trade in contradistinction to trade-mark infringement. The first two assignments of error in this case are in substance that the court below erred in not considering the charge of infringement of the trade-mark "Don Carlos" by

the use of the words "Don Cæsar" as applied to olives, and in not holding that such infringement occurred. These two assignments cannot be sustained. The third assignment is to the effect that there was error in not holding that the use by the defendants of the picture of a plate of stuffed olives applied to bottles of olives infringed the complainant's trade-mark of a picture of a split, stuffed olive. The court below evidently disregarded the charge of infringement of the latter trade-mark; for the learned judge said:

"The charge of infringement of complainant's trade-mark 'Don Carlos' was eliminated by the decision of the Court of Appeals (165 Fed. 624, 92 C. C. A. 58), and the question of unfair competition alone remains."

In our view any consideration of the third assignment relating to the split, stuffed olive trade-mark, as such, is wholly unnecessary to the proper decision of this case. The decision of this court on the former occasion did not involve the question of unfair competition in trade. It could not involve that question for the reason that the defendants had appealed from a decree which did not award an injunction on the ground of unfair competition in trade as contradistinguished from the infringement of a trade-mark (163 Fed. 447), and this court consequently was precluded from any consideration of the question whether the complainant was not entitled to injunctive relief under the charge in the bill of unfair competition. But that question is now properly before this court for decision. The fourth, fifth, sixth, seventh and eighth assignments of error are to the effect that the court below erred (1) in holding "that the use by the defendants of the words 'Don Cæsar' as a mark for olives, with the associated features of bottle, cap, body and neck labels as used by defendants, was not such imitation of complainant's trade-mark 'Don Carlos' as applied to olives, with the associated features of the cap, body and neck labels used by complainant" as to constitute unfair competition in trade with the complainant, (2) in not holding that "the use as aforesaid by defendants of the words 'Don Cæsar' with the above-described associated features of cap and labels upon their packages of olives, was such imitation of the complainant's trade-mark, 'Don Carlos' with the associated features of bottle, cap and labels used by complainant" as to constitute unfair competition in trade with complainant, (3) in holding that "the use by defendants of the pictorial representation of a plate of stuffed olives imprinted upon a neck label having a depending ear and a bottle bearing such label closely resembling in shape the bottle used by complainant, was not such an imitation of complainant's trade-mark, neck label and bottle as to constitute unfair competition in trade with complainant," (4) in not holding that "such use by defendants of such a bottle and neck label and picture imprinted thereon was such imitation of complainant's bottle, neck label and trade-mark as aforesaid as to constitute unfair competition in trade with complainant," and (5) in not holding that "such use by defendants as aforesaid of the words 'Don Cæsar' and the pictorial representation of a plate of stuffed olives, with the associated features of dress of the packages of olives to which such words and picture were affixed, was fraudulently designed and intended so to imitate said trade-marks of

complainant's and the associated features of dress of the package to which the trade-marks were applied by complainant, as to deceive the purchasing public, and to constitute unfair competition in trade with complainant." The three labels represented by Exhibits A, B and C attached to the bill were designed by the complainant personally. The Don Carlos or body label, Exhibit B, was used by him for his olives at least as early as 1895. Owing to his long-continued intercourse with Spaniards in connection with his business, he was often addressed by them as Don Carlos Gulden, and this circumstance not unnaturally suggested to him the idea of adopting and using the words 'Don Carlos' as a mark peculiarly calculated to distinguish olives packed and sold by him from those packed and sold by others. The neck label, Exhibit C, containing within a circle the words "Spanish Queen Olives," and an olive branch bearing leaves and olives on each side of the circle, was designed at the same time as the body label, and with the latter was affixed to bottles containing olives; a red metal foil cap seal being affixed to the tops of the bottles. Complainant's Exhibit 4 represents a bottle of olives as thus dressed. Charles Gulden, Jr., the son and general manager of the business of the complainant, testified without contradiction that he supposed that about seventy-five per cent. of the complainant's business is done under Don Carlos labels, and that such business in the Don Carlos brand of olives amounts to about $200,000 a year. The label, Exhibit A, containing the words "Manzanilla Olives" and a representation of a split olive stuffed with Spanish sweet peppers was designed and printed in 1901. It was affixed to the neck and partially to the body of a bottle, for Manzanilla olives, with "circumferential grooves or corrugations" referred to as rings, of which there are four, and a flaring mouth. The bottle as dressed is represented by Complainant's Exhibit 5. This ring bottle was designed by Charles Gulden, Jr., in the summer of 1901, and, he testified, "then I had Mr. Garwood get up a model, and then we ordered the bottles." He further testified:

"Q. 66. After you got up this ring bottle for stuffed olives, did you order the bottles then from Mr. Garwood's concern? A. Yes, sir. Q. 67. Have you been packing and selling those olives in that form of package since then? A. Yes; it is our leading package for those olives. Q. 68. Can you give us some idea of the extent of your trade in that particular line? A. In quantity, the number of gross? Q. 69. Yes. A. About 45,000 gross, I should think."

The ring bottle was manufactured for the complainant by the Bodine Glass Works, the immediate predecessor of the Williamstown Glass Company, hereinafter referred to, and one hundred gross of such bottles were delivered to him in November, 1901. The complainant's witness Garwood, who has been connected successively with both of the above bottle manufacturing concerns, testified:

"Q. 9. Have you manufactured any of those bottles for him since then? A. Yes; we have manufactured them in very large quantities for him. Q. 10. Can you give us some idea about the quantities you have manufactured for him? A. Well, I should say that we have manufactured at least forty thousand gross of them from that time up to the present time. Q. 11. You notice the particular style and form and configuration of this glass bottle which has been spoken of here as Complainant's Exhibit No. 5, do you? A. I do. Q. 12. At the time that Mr. Charles Gulden, Jr., brought in the sketch, had you

known of that particular style and form of bottle being in the trade or being manufactured by any other person? A. I had never seen anything of just that character and proportions before; the one thing that I had ever seen was a tall oval pepper-sauce bottle with very small rings, but that was an entirely different shaped bottle and for an entirely different purpose. Q. 13. What was the shape of the pepper-sauce bottle? A. It was a tapering oval probably six and one-half to seven inches high. Q. 14. And that you say was of a different form and appearance from this bottle? A. Yes, entirely different; the rings were not more than one-eighth of the size of those."

Complainant's Exhibit 6 is a cylindrical bottle with a flaring fluted base, and bearing the Don Carlos body label, Complainant's Exhibit B, and the neck label, Complainant's Exhibit C, and having a red metal-foil cap seal. This bottle was designed some eight or nine years ago, and is used for Queen olives. On this style of bottle, which is termed the Banquet bottle, the complainant sometimes affixes instead of his Don Carlos label another body label known as the Banquet label. It appears from the evidence that only a very small percentage of the Don Carlos brand of olives has been put up in bottles not having red cap seals.

We shall now advert to some of the evidence directly bearing on the charge of unfair competition by the defendants. The complainant's witness Garwood testified:

"Q. 16. Have you made any ring-shaped bottles for olives of this same general description as Complainant's Exhibit No. 5, for the Messrs. Chance's Sons, the defendants in this case? A. We have made a bottle for them with more rings on it than this bottle. Q. 17. I show you complainant's Exhibit No. 8, defendants' ring bottle of stuffed olives, and ask you if you recognize that bottle? A. Yes; that I think is the bottle that we manufactured for them. Q. 18. When did you manufacture those bottles for the Chances (referring to Exhibit 8)? A. In 1905; I cannot fix the date in the year, but I think it was 1905. Q. 19. What part of the year was it? A. My recollection is that it was in the fall of the year. Q. 20. What were the circumstances under which you made that bottle for them? A. I called there one day and they had a sample of a Gulden ring, and a bottle that another concern in New York used; and they said it was necessary for them to have something of that character to meet the requirements of their trade; and we talked about it; and, as I generally do when I come up against anything of that kind, where we are making a bottle of a certain character for a party, and another party wants a bottle of the same character, I tried to induce them to get up something of their own and not to follow the same style of bottle and identify themselves with it—with their own bottle entirely; that is to say, have a design that they can be identified with. The matter was laid over, if I recollect correctly, to a later date when Mr. Robert Chance insisted that he would have to have a bottle of that character and practically he adopted the bottle of the five-ring style here, and we got up a mold for them and we made some bottles for them. * * * Q. 22. When did you make the first shipment of bottles to him? A. As soon as the mold was completed; I think we shipped 25 gross of bottles; it generally takes from two to three weeks to get up a mold. Q. 23. Have you furnished them with bottles of that kind since? A. In some quantities, yes. Q. 24. When was the last consignment of those bottles you made to the defendant? A. I cannot answer that question as to a definite date; I should think as near as I can recollect from the run of the business that sometime within the last month we made them a small shipment, but I am not absolutely sure about that."

Garwood testified with respect to matters inquired about during the cross-examination of Robert C. Chance, one of the defendants, as follows:

"Q. 461. I quote from the cross-examination of this same witness, as follows: * * * Please state whether or not you at any time made objection or criticized that witness Robert C. Chance, one of these defendants, for imitating or attempting to imitate the goods of competitors to trade, and if so, state as accurately as you can the exact conversation between you? A. There were a number of times when Mr. Robert Chance exhibited bottles packed by other concerns and said that he would have to have similar packages. I can't say that I exactly criticized him, but I did advise him on several occasions that it was not good business policy 'to copy these bottles, and urged him to use certain designs of their own, or to get up special designs of their own, and be identified with said designs as their own property. Q. 462. Was there any conversation of that character between you when you were being requested by him to get up the ring bottle in question, for the defendants; if so, what? A. My distinct recollection is that originally the Gulden bottle was the one talked about as being necessary for his purpose. I told him that that only meant trouble for him and myself, and I thought Mr. Gulden would fight any effort to put a copy of that bottle on the market. The matter was dropped for the time being, and then came up again with the Leggett five-ring bottle before us, and at that time he dropped the Gulden matter and talked entirely about the five-ring bottle."

In point of fact the Leggett bottle had six rings and the witness subsequently so stated. Albert Chance, one of the defendants, testified:

"Q. 798. What other bottles besides those bottles did you use before Mr. Weed came into your employ? A. We used the ring bottle. Q. 799. Have you got a sample of that here? A. Yes, sir. (Witness refers to Complainant's Exhibit No. 8.) Q. 800. Is that the sample ring bottle you used before Mr. Weed came into your employ? A. Yes, sir, that is a sample of the ring bottle. Q. 801. But not with that label? A. Not with this label, no. * * * Q. 804. How long have you used that bottle? A. We have used this bottle since February, 1905. I think that was about the time we got the mold up for that bottle. It came along in March, some time I think in that neighborhood. Q. 805. Will you give us, in your own way, the history so far as you know it of the ring bottle? A. The ring bottle—we came into competition with the ring bottle with Mr. Gulden. Mr. Gulden had a four-ring bottle. Q. 806. Was Mr. Gulden's the first ring bottle? A. So far as we know in America. * * * Q. 811. But Mr. Gulden was the first to pack his olives in America in a ring bottle? A. So far as I know, yes, sir. Q. 812. At the time you adopted the ring bottle, were there any other American ring bottles on the market besides Mr. Gulden's? A. There was another one of Francis H. Leggett's, New York, a six-ring bottle. Q. 813. How long had that been on the market? A. I could not tell you that. * * * Q. 814. Were there any other bottles, American ring bottles, on the market at that time, at the time you adopted your ring bottle? A. Not that I know, for packing olives. There were bottles on the market with peppers in them, little West India peppers in them. * * * Q. 816. The only two ring bottles with which you came in competition were Gulden's and Leggett's? A. That is all. Q. 818. Please state what did occur when you went to Mr. Garwood to have a ring bottle made. A. My brother had a conversation with Mr. Garwood on this subject, and I was present. I did not hear all of the conversation, but I will recite what portion of it I heard. Q. 819. Exactly. A. We had been meeting in competition with Mr. Gulden, with the ring bottle, and Francis H. Leggett & Company, as I stated, and we wanted something to meet this competition. Mr. Garwood was called in, and the question put to him. We had, if my memory serves me right, a six-ring bottle of Francis H. Leggett's, but not a Gulden bottle. Mr. Garwood said this was a six-ring bottle, and why not make a five ring. He said: 'I will make a model and show it to you.' He made the model, and we adopted it. Q. 820. That was in 1905, February? A. That was in 1905. I think he made the mold in February, and along in March we got the bottles. Q. 821. Was that before or after Mr. Weed came into your employ? A. That was before Mr. Weed came with us. Q. 822.

How long? A. Two years, because that would be his—Mr. Weed did not come until January, 1907, and this was in 1905."

We now come to the connection of the defendants' witness Weed with the case. He had been employed by the complainant as a traveling salesman for from four to six years, when, some differences having arisen between the complainant and him touching his remuneration, he wrote August 25, 1906, from St. Louis a letter to the defendant of which the following is a copy:

"Mess. R. C. Chance's Sons, Phila. Pa.      "St. Louis, Aug. 25, 1906.

"Gentlemen: I have represented Chas. Gulden for the past six years in the West, and am thinking seriously of making a change Jan. 1st, 1907. I am now calling on the jobbing trade from Lancaster, Pa., to Denver, Col. I have worked up a large trade in car load lots in the following cities: Pittsburgh, Pa.; Cleveland; Toledo; Detroit; Columbus; Washington C. H., Ohio; St. Louis; Kansas City; & Omaha, Neb. I am positive if I make a change that I can command this trade. I would be pleased to have personal interview with you on my return from the West, and will then explain my reasons for wishing to make change. I can furnish you with list of customers and refer you to any and all of them, and any other particulars you may wish to know. I would be pleased to receive a line from you % Paxton Hotel, Omaha, Neb.      Yours very truly,

"Confidential.      Fred'k. Weed."

Robert C. Chance, one of the defendants, wrote in reply as follows:

"Mr. Fred Weed, Omaha, Neb.      "August 28th, 1906.

"Dear Sir: We are in receipt of your letter of the 25th, and in reply, we would be very much pleased to have an interview with you on your arrival in the East. Any information you give us will be held strictly confidential. We would like to know what amount of goods you have been selling per year, and what you could really guarantee. We work exclusively with the jobbers and packers. We look for business under private labels, that is, of large quantities where we can have the business for the year or for any length of time, people who have been getting goods under their own Brands.

"Awaiting your prompt reply, we remain,

"Very respectfully yours,

"R. C. Chance."

In answer to the above Weed wrote as follows:

"Mess. R. C. Chance's Sons, Phila., Pa.      "Omaha, Neb., Aug. 30, 1906.

"Gentlemen: I beg to acknowledge the receipt of your favor of Aug. 28th, and thank you for your prompt reply. Would say in reply that it would be very hard for me to say what I really could guarantee per year until I look over your full line, but think at personal interview I can satisfy any one in regard to the amount of business I would do for them. My olive & bottle mustard business has run from $100,000 to $140,000 a year for the past six years. I have never sold pickles, ketchup or salid oils. I sell the jobber & packer exclusively in large quantities and have personal acquaintance and trade with all the buyers. I know the olive business thoroughly, and all the packs on the market. When I reach Phila., Pa., would be perfectly willing to furnish you with a list of my customers and you would be at liberty to write any you see fit. I have no objection to private label business. In regard to styles of bottles—can better explain to you at interview what is needed. A letter will reach me directed care above hotel for ten days and will let you know a week ahead when I will reach Phila. Now figure it will be about Oct. 1 to 15.      Yours very truly,

"Fred'k. Weed."

In reply Robert C. Chance wrote as follows:

"Mr. Fred'k. Weed, Yonkers, N. Y.                    "September 15th, 1906.

"Dear Sir: It will be convenient to us for you to call at any time between October 1st and 15th, as you state, and we will then take the matter up thoroughly with you. But we would like to know about what day you could be here, as the writer is often out of the city the fore part of the week. Awaiting your prompt reply, we remain,

"Very respectfully yours,                    R. C. Chance."

It is significant that the foregoing correspondence between Weed and the defendants occurred while the former was in the employ of the complainant, his term of service not expiring until December 31, 1906; that the defendants knew from, if not aside from, the correspondence that Weed was then in the complainant's employ; that Weed stated in his letter of August 25, 1906, his ability "to furnish you with list of customers and refer you to any and all of them, and any other particulars you may wish to know"; that this letter was marked "Confidential"; that in reply to the above letter Robert C. Chance, on behalf of the defendants, states that "any information you give us will be held strictly confidential," and "we would like to know what amount of goods you have been selling per year"; that Weed in his letter of August 30, 1906, stated to the defendants that "I know the olive business thoroughly, and all the packs on the market"; that on his arrival in Philadelphia he "would be perfectly willing to furnish you with a list of my customers and you would be at liberty to write any you see fit," and that "I have no objection to private label business. In regard to styles of bottles—can better explain to you at interview what is needed"; that in the reply of the defendants through Robert C. Chance to the last letter, it is stated that it would "be convenient to us for you to call at any time between October 1st and 15th, as you state, and we will then take the matter up thoroughly with you"; that in the foregoing correspondence the defendants displayed an eagerness to secure the services of Weed, and that at the beginning of 1907 Weed entered into a written contract of service with the defendants. Weed testified:

"Q. 393. Did you ever have any conversation with Mr. Chance as to the labels that were to be used for your trade, and if so, state when it occurred and what occurred? A. Yes, sir, I requested Mr. Chance to get up some new labels. I had quite a number of customers that would not all want the same label—to get up a variety of labels, as many as he thought he could, and submit them to me. He asked me, 'Any particular kind?' I said, 'No, as long as they were gotten up in nice shape and good form.' Q. 394. That was about when? A. That was, I should judge, the latter part of November; during the month of November sometime. * * * Q. 396. When did he submit any labels to you? A. I think in December sometime he sent me a sheet that had three or four labels on. Q. 397. Do you recollect what they were? A. Yes, sir; 'Don Cæsar,' 'Regine' and the 'Penn Club.' Q. 398. And what did you do with regard to them? Did you change them in a any way? A. No, sir. * * * XQ. 718. Have you ever known any trade-name for olives except 'Don Carlos' and 'Don Cæsar' on which the word 'Don' formed a part? A. No, sir. Q. 719. Since you have been employed by Mr. Chance, have you traveled over the same territory as for Mr. Gulden, or different territory? A. I have had some additional territory besides the regular territory. * * * RDQ. 749. While you were with Mr. Gulden, you visited the territory you had the last year. That is, what I mean is, did you abandon any territory while you were with

Mr. Gulden? A. Possibly a few very small towns, where it would not pay to go. RDQ. 750. But substantially, I mean, at different times? A. Substantially the same trade I controlled and contracted for all the time I was with Mr. Gulden."

The defendants' witness Cake, for many years a representative in Philadelphia of the United States Printing Company which was engaged in color printing, testified as to an interview with Albert Chance, one of the defendants, at their office in the fall of 1906:

"Mr. Chance, who is a customer of ours, sent for me and wanted to get up an olive label, and he showed me a 'Don Carlos' label, and said he wanted it equal in quality, and emphasized particularly he wanted to avoid any resemblance of the same. I asked him if I could have the Don Carlos label, and he hesitated and said: 'No; you better not take it, in order to avoid anything similar in getting up the sketch.' I prevailed on him to let me have it and told him I would return it right away. I went up to the office and made an outline on what we called a sketching form and put the name in 'R. C. Chance's Sons,' and so forth, and took the 'Don Carlos' label back to him. It was not in our New York office, because I had obligated myself to give it to him. I sent the sketching order over, and I avoided the color in the branch of olives, I avoided the style of the die * * * and I took and outlined the die that I thought was the best for the shape of the bottle. The labels themselves are the result."

Cake wrote November 19, 1906, a letter of instructions to the United States Printing Company with reference to labels to be made for the defendants, in which he said:

"Dear Sirs: In reference to the Don Cæsar olive sketch that we have ordered for the above firm, we want you to make a good embossed sketch. They want something original, if you can get it. I am enclosing you two of Chas. Gulden Don Carlos Brand of olive labels. They want something fancy like these. I want to call your particular attention to the gold and paper in these samples. Chance wants to get up something as fine as these, if possible, in quality. Another thing I want to call your attention to, in making sketches our copies of olives are always too green. These two enclosed labels may be a little light, but they are really nearer the color than the usual green ones which we have made. I am sending you by express a very handsome sample of olives showing the color. Could we not make a natural process cut of labels and get the exact color. You will notice they vary a little. I would like you to hand this letter to Mr. Snyder. Now I have given my word that I will return these two labels Don Carlos Brand to Mr. Chance, and I want you to return them to me. On this Don Cæsar sketch I want a handsome embossed original design in keeping in quality with these Don Carlos labels enclosed."

Cake further testified as to what occurred at an interview he had with Albert Chance, one of the defendants, at their office in Philadelphia:

"XQ. 42. You say you got up these names together? A. Yes, sir. XQ. 43. What other packers of olives, to your knowledge, have used names with the word 'Don' in them? A. I do not know but of the two. XQ. 44. What suggested the name 'Don Cæsar' to you? A. Spanish. XQ. 45. What suggested that particular name to you? A. Well my idea that it was a Spanish name, and it is very common to use the word 'Don' abroad. XQ. 46. You say you had not known of any excepting those two brands with the word 'Don'? A. No, sir. XQ. 47. Then, why was it suggested to you? A. Wanted to get a name for it. XQ. 48. What suggested the name to you? A. I am telling you that Spanish people—these are Spanish olives—at least, I thought so, and we—I don't know how to explain that. Mr. Chance had the 'Don Carlos' label there, and it appealed to me right away

why we couldn't use the word— XQ. 49. Then the name 'Don Cæsar' was suggested to you by the name 'Don Carlos'? A. Yes, sir; with several other 'Dons' we had in our mind. * * * XQ. 74. Have you got dies of a necktie label, as you call it, of the shape of this one of the ring bottle of Manzanilla olives? A. Yes, sir. XQ. 75. You say Mr. Chance took a quarter and drew that? A. Yes; that is right. XQ. 76. Did he say why he wanted a necktie label of that shape? A. No, sir; I don't think he did, only to cover up some portion of this long neck. XQ. 77. Did he give you the wording to be printed on that necktie label with the depending ear? A. Yes. XQ. 78. What other packing house do you know of that uses a neck label of that shape except Mr. Gulden's and Mr. Chance's? A. I am not familiar with the olive trade only here in Philadelphia, and I do not know of anybody that uses them in Philadelphia. I do not sell them. * * * XQ. 92. Were the labels 'Don Cæsar,' 'Regine' and 'Penn Club' all delivered at the same time to R. C. Chance's Sons? A. I do not know."

The witness having obtained information on this point testified that the Don Cæsar and Penn Club labels were delivered January 29, 1907; the Regine label February 5, 1907, and the Manzanilla Necktie and the Queen Necktie March 27, 1907. The defendants wrote to Price Brothers & Company, engaged in the business of printing labels in New York City, November 17, 1906 as follows:

"Gentlemen: We enclose you three (3) sizes of labels, on which we want you to give us an estimate and sketch, under the Don Cæsar brand, with an Olive spray in the center, and R. C. Chance's Sons, Philadelphia, underneath. We want it in Bright Gold with a border and die the same as our Crown Brand. The lettering we want gold, shaded with red and black, or rather gold and red shaded with black. The Olive Spray we want the color of Olives, about the color of the enclosed cut. We want a very striking and beautiful label. You can give us an estimate on one hundred thousand (100,000) divided up in the three (3) sizes. If you think this would look very well embossed, give us an estimate on them, but we would want a glazed paper, instead of varnished. Respectfully yours,

"R. C. Chance's Sons."

The complainant's witness, Collins, who is a salesman for Price Brothers & Company, testified:

"Q. 7. Did that firm ever have an application from R. C. Chance's Sons, of Philadelphia, for the printing of a label for olives? A. Yes, sir. Q. 8. About when did that occur? A. In December, 1906. Q. 9. Just state what occurred there. What was the transaction? A. They asked us for a quotation and to make them a sketch. Q. 10. Did they submit anything to you at that time? A. Well, they sent on a blank piece of paper with the name, with a vignette in the centre, cut from another label. * * * Q. 13. What was the vignette that was placed in the centre? A. It was a vignette of olives. Q. 14. What was the vignette of olives cut from, from whose label? A. I cannot tell you that; it was cut from some old label. Q. 15. Look at this label which I now hand you, called 'Don Carlos' Olives, Charles Gulden, N. Y.,' and state whether or not that refreshes your recollection as to the matter? A. To the best of my recollection it was in the same colors, but whether it was the same identical vignette or not, I could not say. Q. 16. How did it resemble this one? A. The color scheme was about the same, yellow and black shading. Q. 17. How about the shape of it? A. Well, it was a blank piece of paper. Q. 18. And they had pasted this vignette on a blank piece of paper? A. Yes, and they had sent on another label which we had been making for them for years, a label in this shape—instead of making what we call a landscape shape—it was made in a portrait shape. Q. 19. That was a vertical oval? A. Yes, and in different colors from this. They said to make it on the same size piece of paper but with a scalloped edge. Q. 20. You had been making a vertical oval before that? A. Yes. Q. 21.

What kind of a label was that? A. Queen Olive label. Q. 22. What change did they want you to make in it from the old label? A. To make it in this shape. Q. 23. This is a longitudinal oval? A. Yes, what we called a landscape. Q. 24. What is the technical name of the other? A. Portrait. Q. 25. So they wanted you to change from the portrait shape to the landscape shape? A. Yes, to make it with a scalloped edge. Q. 26. How about the picture on the label; what was that to be? A. They had already pasted—they had said nothing about making it identically the same, but the artist, instead of making a new one, which is customary, he simply pasted the old vignette right in the new sketch, which is unusual, because, in making a new label, why, we make it, as a rule, entire. Q. 27. Then, the way it came to your firm was that they had pasted in the centre of a piece of paper of 'landscape shape' a vignette of olives? A. Yes. Q. 28. And what were the colors? A. Yellow and black. Q. 29. And they wanted from you an estimate on that label, did they? A. Yes. Q. 30. Had that vignette been cut from some old label? A. Yes, it had been cut from some old label. Q. 31. Could you tell what label it had been cut from? A. Well, after I saw this, I thought it came out of one of Gulden's labels, but I could not swear to it. Q. 32. Did it resemble Gulden's label? A. Yes. Q. 33. It looked as if it had been cut from Gulden's label, did it? A. Of course I didn't know that at the time, because our rule is, if we know it, we refuse to copy another man's label. Q. 34. But, after that, you saw the Gulden label? A. I saw that at Mr. Gulden's office. Q. 35. And after seeing that, then you said that this label which they sent you resembled the Gulden label? A. Yes, the vignette did. * * * Q. 40. Do you remember whether or not the words 'Don Cæsar' were printed above the vignette? A. Yes, they were. Q. 41. And the name 'R. C. Chance's Sons'; was that beneath it? A. Yes."

The witness Gulden, son of the complainant, during whose testimony the letter of November 17, 1906, from the defendants to Price Brothers & Company was introduced, testified:

"RDQ. 286. In this connection I hand you three labels, and ask you what they represent? A. They represent our three sizes of Don Carlos labels. RDQ. 287. You use three sizes of that label, do you? A. Yes. RDQ. 288. And these are samples of those three sizes? A. Yes, sir. RDQ. 289. How do they compare with the three sizes of proposed labels attached to this letter from Chance's to Price Brothers (Exhibit 14)? A. They are the same size, with the exception of the larger one in which there is a slight difference."

Albert Chance, one of the defendants, after referring to the correspondence between Weed and them, testified:

"Q. 903. In consequence of that correspondence, did you have an interview with Mr. Weed, and when and where? How did it come about? A. We had an interview with Mr. Weed sometime between October—along in October, I think it was; I cannot give the exact date; sometime in October. Q. 904. Did you visit him or did he visit you? A. He visited us. * * * Q. 907. Did you have any subsequent communication or interview with him? A. I had not. Q. 908. Or did your brother, do you know, between then and the 1st of January? A. Yes; I think my brother had. He came again the second time to see us, but I had no interview with him. Q. 909. As a result of these interviews, did Mr. Weed enter your employ? A. He did. Q. 910. After your interviews with Mr. Weed, did you adopt any additional labels, and, if so, please state as near as you can recollect the history of those labels? A. After the interview with Mr. Weed, he stated that he could put brands on the market, and we took that question up, and we considered changing the labels, making new labels, but there was no brand suggested at all by him. Q. 911. Right here; you said changing the labels. Had you discontinued the use of your old labels? A. Not at all; no. * * * Q. 915. What was the object in adding additional labels to your existing stock of labels? A. It was in order to increase our trade and the territory which this man was to cover, and that is our object in

changing our labels at anytime, in order to produce a new brand or get away from the old stereotype styles, and we are always thinking out something in that way. * * * Q. 918. Where did you have that interview with Mr. Cake? A. In my office. Q. 919: And did you have any labels there and what were they? A. I had no label at the time that I talked with him, but he asked me to give him some idea as to what I wanted, and I picked up a label that was on my desk, more to get the quality of the paper, and not the general design of the coloring of it at all, and this label was the 'Don Carlos' label, and Mr. Cake said, 'Can I have that label'? I said, 'No; I don't want anything like that; I don't want you to use this label. I want something original. I want your ideas and not somebody else's ideas,' because I did not care for them, and I said I would not consider, I would not think of it for one moment 'you taking this label.' He says, 'Let me have this label until I go back to the office; I will positively assure you that it will never leave my hands, and I will return it to you; I will not use it in any way.' I hesitated even on that. He says, 'You need not be afraid, I will positively promise you—I think you have knowledge of me, and have done business long enough with me, that I would be honorable in it.' I said, 'I do not doubt that at all, but it is a question of this label. I do not like the idea of it.' So he took it away. The next morning he returned it to me, according to what he said. * * * XQ. 998. You were familiar with the shapes of bottles and the styles of labels used by Mr. Gulden for a considerable time previous to these dates? A. Somewhat, in some of his styles, yes, sir. XQ. 999. Before you adopted that ring bottle, you had seen his ring bottle? A. I had seen his ring bottle, yes, sir. XQ. 1000. Before you adopted the neck label which you are now using for the ring bottle you had seen the label on his ring bottle? A. Yes, sir; I had seen it on his bottle. * * * XQ. 1040. What was your object in adopting the 'Don Cæsar' label? A. More to add brands—different brands to our general packing. * * * XQ. 1068. Why, having a package which was known to the trade as yours distinctively, did you adopt a ring bottle that you knew was Mr. Gulden's design? A. I did not know it was Mr. Gulden's design. XQ. 1069. You did not know it? A. That particular bottle we adopted before Mr. Gulden's design. XQ. 1070. Did not you know that that shaped bottle made by the Williamstown Glass Works was made for Mr. Gulden? A. I so testified; yes, sir. XQ. 1071. Then you knew that the ring bottle in question was Mr. Gulden's type of bottle? A. Yes, sir—not his type of bottle. XQ. 1072. His bottle; made for him. That is what you said. A. I said a four-ring bottle. Mr. Gulden had a four-ring bottle. * * * XQ. 1211. Where did you get the 'Don Carlos' labels which you furnished to Mr. Cake? A. They were left with us by Mr. Weed. XQ. 1212. How long before? A. I cannot just answer that. XQ. 1213. For what purpose? A. No purpose, whatever. * * * XQ. 1218. When did you first adopt the body label for bottles with the picture of a plate of stuffed olives thereon? A. That was about the time that we got up the labels 'Regine' and 'Penn' and 'Don Cæsar.' They were all about the same time. XQ. 1219. Then it was about the same time that you got up the neck label on the bottle of stuffed olives, Complainant's Exhibit No. 8? A. About the same time, yes, sir. XQ. 1220. What was your purpose in changing the form of label on that bottle from the style which you had formerly used to complainant's exhibit, defendants' bulb bottle, stuffed olives? A. I had no other object only than just to change the label. That was all. XQ. 1221. Why did you want to change the label? A. We were constantly thinking of something new. I cannot give you directly just what would lead us up to these things. * * * XQ. 1231. Name any particular set of labels of any packer that, to your mind, is similar to Gulden, except your own. And I mean by this, the entire dress of the bottle, body label, neck label and seal. A. I do not recall any one particular name. XQ. 1232. Then you know of no other olive packer who dresses his bottle of olives in a manner as similar to Gulden as the dress that you give to yours? A. I cannot answer that question. XQ. 1233. Do you know of any packer of olives who dresses his bottles of olives in any way similar in general appearance to Gulden? A. I cannot answer that question. XQ. 1234. Do

you know of any olive packer who uses a trade-name, or trade-mark on his olives having the previous 'Don'? A. No. XQ. 1235. Do you know of any one who has a trade-mark in which appears the name 'Cæsar,' either with or without the 'Don'? A. Not that I can recall."

The explanation made by the defendants of their adoption and use of the words Don Cæsar is far from satisfactory. Robert C. Chance, who has been engaged in the olive business of the defendants for considerably more than thirty years, stated in substance that those words were suggested to him by the play of Don Cæsar de Bazan, rendered in the old Chestnut Street Theatre in Philadelphia some fifteen years previously, which had strongly impressed him. He further testified:

"XQ. 1355. Did you suggest any names to Mr. Oake? A. I suggested the 'Don Cæsar' label. That was my idea. * * * XQ. 1364. What was your object in adopting a name with the prefix 'Don'? A. I have just said that that struck me as a good brand. XQ. 1365. Why did it strike you as a good brand? A. I was very much pleased with the play, and the name generally always impressed me. XQ. 1366. What had the play to do with olives? A. Nothing; had nothing at all to do with olives. XQ. 1367. Why was the name of 'Don Cæsar' associated? A. I was getting up a brand. XQ. 1368. How long before was it you saw the play? A. Possibly it might have been fifteen or more years, it always impressed me though. * * * XQ. 1376. Why was it the name 'Don Cæsar' had not impressed itself upon your mind so you used it during those fifteen years? A. It was not necessary at that time, possibly, to get up brands."

The question naturally arises why Robert C. Chance who states he was so impressed with the above-mentioned play waited until the fall of 1906 before utilizing the words "Don Cæsar" in the conduct of the defendants' business. Albert Chance states that the defendants "were constantly thinking of something new" in the matter of labels. for the purpose of adding to their brands and enlarging their business. The complainant adopted the words "Don Carlos" as early as 1895. But eleven years rolled around, and it was not until after the defendants had negotiated with Weed, while the latter was still in the employ of the complainant, and familiar with the Don Carlos label, that the defendants adopted and used the words "Don Cæsar" on their body labels. Further, instead of adopting the words "Don Roberto" or "Don Alberto," they chose words of which not only the title "Don" was identical with that of the complainant's trade-mark, but the name "Cæsar" has the same number of letters and begins with the same initial as "Carlos." The play of Don Cæsar de Bazan may indeed have suggested the use by the defendants of the words "Don Cæsar" but, if so, it was only in connection with a consideration by them of the words "Don Carlos." That "Don Cæsar" was adopted by them with a wrongful intent to divert to themselves an important branch of the complainant's trade, we have, upon all the evidence in the case, no reason to doubt. We are unable to accept any theory of chance coincidence by way of explanation. Further, the evidence in the case, from which we have largely quoted, when considered in its entirety, with the only reasonable deductions to be drawn from it, clearly shows that the defendants had a set and wrongful purpose to benefit themselves at the expense of the complainant, by so packing, dressing and selling their olives as to palm them off upon ordinary, unwary, or ignorant consuming purchasers as olives packed and dressed by him. The

defendants' bottles with their labels, Complainant's Exhibits Nos. 7, 8 and 9, particularly complained of, while differing somewhat in details from those of the complainant, Exhibits Nos. 4, 5 and 6 are in their general appearance strikingly similar. They are confusing, deceptive and misleading and, as already stated, intended by the defendants so to be. When the bottles of the defendants with their labels are viewed side by side with the bottles of the complainant with their labels, differences may be perceived which might prevent confusion on the part of purchasers who have both before them at the same time. But purchasers may not and do not as a rule have both simultaneously before them for comparison. If they have come to associate the complainant's bottles and labels with olives packed and sold by him and thereafter see the olive bottles and labels of the defendants, the complainant's bottles and labels not being at the time before their eyes, it is highly probable that purchasers in the exercise of only such degree of care as is usually observed by and reasonably to be expected from them under varying conditions of knowledge, intelligence and nationality, will be misled or deceived into the belief that in buying olives packed and dressed by the defendants, they are getting those of the complainant. The fact that salesmen or middlemen are in a position to distinguish the olives packed by the defendants from those packed by the complainant by reason of differences in bottles or labels is unimportant. The material point here is the liability of ordinary consuming purchasers to be confused and misled on the subject. In Florence Mfg. Co. v. J. C. Dowd & Co., 178 Fed. 73, Judge Coxe in delivering the opinion of the circuit court of appeals for the second circuit expressed views in which we fully concur on the subject of unfair competition in trade, as follows:

"The law has a threefold object: First, to protect the honest trader in the business which fairly belongs to him; second, to punish the dishonest trader who is taking his competitor's business away by unfair means; and, third, to protect the public from deception.. * * * It is so easy for the honest business man, who wishes to sell his goods upon their merits, to select from the entire material universe, which is before him, symbols, marks and coverings which by no possibility can cause confusion between his goods and those of competitors, that the courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them. The law is not made for the protection of experts, but for the public— that vast multitude which includes the ignorant, the unthinking and the credulous, who, in making purchases, do not stop to analyze, but are governed by appearances and general impressions."

In National Biscuit Co. v. Baker (C. C.) 95 Fed. 135, Judge Lacombe, said:

"As has been often pointed out before, it makes no difference that dealers in the article are not deceived. No one expects that they will be. It is the probable experience of the consumer that the court considers. Here, too, we have the manufacturer of the articles complained of, who explains, as usual, that, in adopting a trade-name by which to identify his own product, he has been most 'careful not to trespass on any rights' of complainant, and that 'after considerable thought' he selected a name which should make the difference between his goods and complainant's distinct and plain, so that there could be no possibility of mistake.' It is a curious fact that so many manufacturers of proprietary articles, when confronted

with some well-advertised trade-name or mark of a rival manufacturer, seem to find their inventive faculties so singularly unresponsive to their efforts to differentiate. * * * There are, as also is usual, a number of minor differences between the forms and the dress of the two packages, which are expatiated upon in the affidavits and the brief; but no one can look at both packages without perceiving that there are strong resemblances, which could easily have been avoided had there been an honest effort to give defendant's goods a distinctive dress. Both name and dress are clearly calculated to mislead, and the statements that both were adopted with an eye single to differentiation strain the credulity of the court beyond the breaking point."

In Lever v. Goodwin, L. R. 36 Ch. Div. 1, an appeal was taken from a decree of Mr. Justice Chitty in favor of the complainants in a case of unfair competition in trade. The decree was affirmed. In his decision he said:

"Then comes the case where the manufacturer, by devices which are to accompany the goods on their sale in the market, gets them up in such a form as to be calculated to deceive the ultimate buyer into the belief that the goods which he, the manufacturer, is putting on the market are the goods of some other maker. Here, generally speaking, a double fraud is committed: First, there is the fraud which is perpetrated on the ultimate buyer; and, secondly, there is a fraud perpetrated on the other manufacturer, who loses part of his trade. In this class of cases the trade is seldom deceived, the retail dealers know from whom they are buying, and if there is a fraudulent device they are rarely taken in by it. But in such a case the manufacturer puts an instrument of fraud into their hands. Now it has been said more than once in this case, that the manufacturer ought not to be held liable for the fraud of the ultimate seller—that is, the shop keeper or the shop keeper's assistant; but that is not the true view of the case. The question which I have to try is whether the defendants have or have not knowingly put into the hands of the retail dealers the means of deceiving the ultimate purchasers."

The evidence shows that olives packed and dressed by the defendants have been mistaken for those of the complainant, and it appears from the testimony of Gulden, the general manager of the complainant's business, that in a single year, from December 1906, to December 1907, in the district or territory previously canvassed by Weed, there was a falling off in such business of $24,750, representing a loss to the complainant of $5,000, of which ninety per cent. was in the Don Carlos brand of olives. No importance is to be attached to the fact that the complainant has packed and sold olives in various bottles dressed differently from those particularly referred to in his bill, whatever might be its effect in a suit limited to a charge of infringement of trade-marks. The question now before us involves unfair competition in trade as contradistinguished from the infringement of trade-marks, and the defendants, having been shown to have indulged in unfair competition with respect to the business of the complainant carried on under certain labels and packages, are not entitled to immunity by reason of the fact that the complainant has used in his business other bottles and packages with respect to which no charge of unfair competition can justly be sustained against them.

We think that an injunction should be granted in this case perpetually restraining the defendants, their servants, agents and employés, from directly or indirectly packing and selling or offering for sale stuffed Manzanilla olives in any ring bottle bearing a neck label sim-

ilar or substantially similar to that shown in Complainant's Exhibit 8, "defendants' ring bottle of stuffed olives;" and also from directly or indirectly packing and selling or offering for sale Spanish olives in any bottle bearing a body label similar or substantially similar to the Don Cæsar label shown in Complainant's Exhibit No. 7, "defendants' bottle of Don Cæsar olives;" and also from directly or indirectly packing and selling or offering for sale any Spanish olives in any bottle with a flaring or fluted base and bearing a body label similar, or substantially similar to the Don Cæsar label shown in Complainant's Exhibit No. 9, "bottle of olives with flaring bottom," or bearing a neck label similar or substantially similar to that shown in Complainant's Exhibit No. 8, "defendants' ring bottle of stuffed olives;" and also from directly or indirectly packing or selling or offering for sale any Spanish olives in any bottle which in its configuration and its label or labels is or will be similar or substantially similar to Complainant's Exhibit No. 4, Complainant's Exhibit No. 5, or Complainant's Exhibit No. 6. The complainant is also entitled to recover from the defendants all profits and damages lost and sustained by him by reason of all sales by the defendants of Spanish olives bottled and labeled as shown in Complainant's Exhibit No. 7, Complainant's Exhibit No. 8 and Complainant's Exhibit No. 9, or bottled and labeled in such manner as to be substantially similar to the three last-named exhibits or any of them; and to an account therefor. The decree below must be reversed, with costs, and with directions for such further proceedings in the court below as will afford the complainant relief pursuant to this opinion; and it is so ordered.